United States District Court
Southern District of Texas

**ENTERED**

September 01, 2016

David J. Bradley, Clerk

## UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF TEXAS
## HOUSTON DIVISION

| | | |
|---|---|---|
| KIEWIT OFFSHORE SERVICES, LTD., | § | |
| | § | |
| *Plaintiff,* | § | |
| | § | |
| v. | § | CIVIL ACTION H-15-1299 |
| | § | |
| DRESSER-RAND GLOBAL SERVICES, INC., | § | |
| | § | |
| *Defendant.* | § | |

### MEMORANDUM OPINION & ORDER

Pending before the court are (1) plaintiff Kiewit Offshore Services, Ltd.'s ("Kiewit") motion for partial summary judgment on defendant Dresser-Rand Global Services, Inc.'s ("Dresser-Rand") counterclaim for damage to modules (Dkt. 15); (2) Kiewit's motion for partial summary judgment on Dresser-Rand's counterclaim for warranty damages (Dkt. 17); (3) Kiewit's motion for partial summary judgment on Dresser-Rand's counterclaim for liquidated damages under third party contract (Dkt. 19); (4) Kiewit's motion for partial summary judgment on payment of Invoice DR-07 (Dkt. 22); (5) Dresser-Rand's motion for summary judgment on Kiewit's complaint (Dkt. 46); and (6) Kiewit's motion for partial summary judgment on payment of Invoices DR-04B, 05 and 06 (Dkt. 47).  Having considered the motions, related briefing, record evidence, and applicable law, the court is of the opinion that (1) Kiewit's motion on Dresser-Rand's counterclaim for damage to modules should be GRANTED; (2) Kiewit's motion on Dresser-Rand's counterclaim for warranty damages should be GRANTED; (3) Kiewit's motion on Dresser-Rand's counterclaim for liquidated damages should be GRANTED; (4) Kiewit's motion on payment of Invoice DR-07 should be GRANTED; (5) Dresser-Rand's motion should be GRANTED IN PART and DENIED IN PART; and (6) Kiewit's motion on payment of Invoices DR-04B, 05, and 06 should be GRANTED.

# I. BACKGROUND

On April 23, 2012, Dresser-Rand solicited a bid from Kiewit for the engineering, design, and fabrication of two 1220 ton litoral compression modules (the "Modules"). Dkt. 1 at 2. The Modules were to be installed on an offshore platform in the Gulf of Mexico owned by Dresser-Rand's client, PEMEX Exploration and Production ("PEMEX") (the "Project"). *Id.* Dresser-Rand had previously agreed to acquire the Modules for PEMEX pursuant to a purchase order (the "Purchase Order"), to which Kiewit was not a party. *See* Dkt. 20, Ex. B-1.

On January 14, 2013, Dresser-Rand accepted Kiewit's bid, and the parties entered into a contract (the "Contract"). *See* Dkt. 52, Ex. A. Under the Contract, Kiewit agreed to perform a variety of tasks, including the engineering, fabrication, and sea fastening of the Modules. *Id.*, App. E at Tbl.1. Kiewit subcontracted certain engineering services to Excel Engineering ("Excel"). Dkt. 1 at 3 n.2. The Project was scheduled to be completed on February 12, 2014. Dkt. 52, Ex. A, App. A at Art. 302. The completion date was subsequently extended to February 15, 2014. Dkt. 1 at 2. On February 14, 2014, Kiewit delivered the Modules and Dresser-Rand accepted them. Dkt. 1, Ex. 2.

The Contract indicated that the "Contract Price before Change Orders" would total $27,271,336.00. Dkt. 52, Ex. A, App. A at Art. 701. The parties dispute how and to what extent this price was subject to change. While working on the Project, Kiewit submitted eight invoices to Dresser-Rand, reflecting total charges of $42,792,860. Dkt. 47, Ex. A at 2. Dresser-Rand paid the first four invoices, totaling $33,265,588. *Id.* However, Dresser-Rand refused to pay the remaining four invoices, totaling $9,486,241. *Id.*

On May 14, 2015, Kiewit filed this lawsuit against Dresser-Rand, raising claims for breach of contract, promissory estoppel, and unjust enrichment. *Id.* at 6–7. Kiewit alleges that Dresser-Rand breached the Contract by failing to compensate Kiewit for the work it performed and invoiced.

2

*Id.* at 6.  Further, Kiewit alleges that Dresser-Rand breached the Contract by failing to timely provide the detailed information Kiewit needed to complete the Modules.  *Id.* at 5–6.  As a result of Dresser-Rand's failure to timely provide this information, Kiewit asserts that it "worked overtime, implemented schedule work-arounds and design sequence changes, and accelerated its work to maintain the Scheduled Completion Date, all with Dresser-Rand's knowledge."  *Id.* at 5.  Kiewit seeks to recover approximately $10 million for Dresser-Rand's failure to pay the final four invoices, an additional $7 million for Dresser-Rand's failure to timely provide the information necessary to complete the Modules, and attorney's fees.  *Id.* at 6–7.

On June 12, 2015, Dresser-Rand filed an answer and a counterclaim for breach of contract. Dkt. 3.  In its counterclaim, Dresser-Rand alleges that "Kiewit has failed to properly perform its contractual duties including but not limited to timely delivery of its services, has provided defective work, has failed to adhere to its schedule, all causing damages to the Modules, delays and losses to Defendant Dresser-Rand in an amount currently unknown but in excess of $1 million."  *Id.* at 7. Additionally, Dresser-Rand alleges that Kiewit's failure to timely and properly perform resulted in delays which caused PEMEX to assess over $1.3 million in liquidated damages against Dresser-Rand.  *Id.*  Dresser-Rand claims that Kiewit should reimburse Dresser-Rand for these liquidated damages.  *Id.*  Dresser-Rand therefore seeks to recover over $2.3 million in damages, plus attorney's fees.  *Id.* at 8.

The parties filed a series of motions for summary judgment, which have been fully briefed and are ripe for disposition.  Dkts. 15, 17, 19, 22, 46, 47.  On July 12, 2016, the court heard oral argument on the motions.  Dkt. 60.

## II. LEGAL STANDARDS

### A.  Summary Judgment Standard

A court shall grant summary judgment when a "movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(c).  "[A] fact is genuinely in dispute only if a reasonable jury could return a verdict for the non-moving party."  *Fordoche, Inc. v. Texaco, Inc.*, 463 F.3d 388, 392 (5th Cir. 2006).  The moving party bears the initial burden of demonstrating the absence of a genuine issue of material fact.  *Celotex Corp. v. Catrett*, 477 U.S. 317, 323, 106 S. Ct. 2548 (1986).  If the party meets its burden, the burden shifts to the non-moving party to set forth specific facts showing a genuine issue for trial.  Fed. R. Civ. P. 56(e).  The court must view the evidence in the light most favorable to the non-movant and draw all justifiable inferences in favor of the non-movant.  *Envtl. Conservation Org. v. City of Dall., Tex.*, 529 F.3d 519, 524 (5th Cir. 2008).

In this case, the parties have filed cross motions for summary judgment with respect to three of the four invoices that Dresser-Rand has refused to pay.  *See* Dkts. 46, 47 (motions for summary judgment addressing Invoices DR-04B, 05, and 06).  Where the parties file cross motions for summary judgment on an issue, the court must "review each party's motion independently, viewing the evidence and inferences in the light most favorable to the non-moving party."  *Ford Motor Co. v. Tex. Dep't of Transp.*, 264 F.3d 493, 498 (5th Cir. 2001).

### B.  Principles of Contract Interpretation

The Contract contains a choice of law clause, indicating that Texas law will govern the relationship between the parties.  Dkt. 52, Ex. A at Art. 205.  Choice of law clauses are presumptively valid.  *Mitsui & Co. (USA) v. Mira M/V*, 111 F.3d 33, 35 (5th Cir. 1997).  Neither

party has disputed the applicability of the choice of law clause to this dispute. Accordingly, the court will apply Texas law in interpreting the Contract.

Under Texas law, the court decides as a matter of law whether a contract is ambiguous "by examining the contract as a whole in light of the circumstances present when the contract was entered." *Columbia Gas Transmission Corp. v. New Ulm Gas, Ltd.*, 940 S.W.2d 587, 589 (Tex. 1996). Notably, the parties have consistently maintained that the Contract is unambiguous. *See, e.g.*, Dkt. 15-1 at 2; Dkt. 46 at 3. Contract language is unambiguous when it "can be given a certain or definite meaning." *Universal Health Servs., Inc. v. Renaissance Women's Grp., P.A.*, 121 S.W.3d 742, 746 (Tex. 2003). By contrast, "an ambiguity arises when an agreement is susceptible to more than one reasonable meaning." *Id.* If a contract is ambiguous, the parties' intent is a question of fact. *Grohman v. Kahlig*, 318 S.W.3d 882, 887 (Tex. 2010). However, an unambiguous contract should be interpreted by the court as a matter of law, and the court must enforce the contract as written. *Id.*; *Heritage Res., Inc. v. NationsBank*, 939 S.W.2d 118, 121 (Tex. 1996). "In construing a written contract, the primary concern of the court is to ascertain the true intentions of the parties as expressed in the instrument." *Valence Operating Co. v. Dorsett*, 164 S.W.3d 656, 662 (Tex. 2005). The court "should examine and consider the entire writing in an effort to harmonize and give effect to all the provisions of the contract so that none will be rendered meaningless." *Id.* The court gives the contract terms their "plain, ordinary, and generally accepted meanings unless the contract itself shows them to be used in a technical or different sense." *Id.*

### III. KIEWIT'S MOTION FOR PARTIAL SUMMARY JUDGMENT ON DRESSER-RAND'S COUNTERCLAIM FOR DAMAGE TO THE MODULES

#### A. Parties' Arguments

On November 24, 2015, Kiewit filed a motion for partial summary judgment on Dresser-

Rand's counterclaim for damage to the Modules. Dkt. 15. In its counterclaim, Dresser-Rand states that it seeks to recover for Kiewit's "failure to properly perform its contractual duties . . . all causing damage to the Modules, delays and losses to Defendant Dresser-Rand in an amount currently unknown but in excess of $1 million." Dkt. 3 at 7. Kiewit argues that, under the Contract, Dresser-Rand cannot recover for any alleged damage to the Modules. Dkt. 15-1 at 7–10. Kiewit contends that, once the Modules were delivered to Dresser-Rand, they became "Company-Owned Items" under the Contract. *Id.* at 3–4; *see also* Dkt. 52, Ex. A at Arts. 201(c), 1101. Article 903 of the Contract explicitly states that Dresser-Rand "shall at all times '**be responsible for and hold harmless and indemnify**' [Kiewit, its subcontractors, and suppliers] from and against Claims arising in connection with damage to or loss of Company-Owned Items '**REGARDLESS OF FAULT**.'" Dkt. 52, Ex. A at Art. 903. Kiewit therefore argues that, under Article 903, Dresser-Rand is required to indemnify Kiewit for any damage to the Modules. Dkt. 51-1 at 8. Accordingly, Kiewit contends that Dresser-Rand cannot maintain its counterclaim for damage to the Modules. *Id.* at 8–10.

In response, Dresser-Rand states that "Dresser-Rand's Counterclaim does not allege that Kiewit damaged the modules that it engineered and fabricated. Rather, Dresser-Rand's Counterclaim alleges that Kiewit breached the contract by (1) performing defective work; (2) failing to comply with its contractual warranty obligations; and (3) failing to adhere to the Contract price." Dkt. 28 at 1–2. Dresser-Rand further states that it "does not allege that Kiewit somehow damaged the modules, which would possibly implicate Article 903 of the Contract. Instead, Dresser-Rand alleges that Kiewit defectively engineered and fabricated the modules, which was Kiewit's core responsibility under the Contract. In these circumstances, Article 903 plainly does not apply." *Id.* at 7.

6

In reply, Kiewit explains that it filed its motion for partial summary judgment in response to the phrase in Dresser-Rand's counterclaim alleging that Kiewit's actions "caus[ed] damages to the Modules." Dkt. 38 at 1; *see also* Dkt. 3 at 7. Kiewit states that it does not seek a ruling that Article 903 forecloses all claims for breach of contract; rather, it merely seeks a ruling that Article 903 would preclude any claim arising out of damage to the Modules. Dkt. 38 at 2. Further, Kiewit contends that Dresser-Rand's arguments are entirely non-responsive to Kiewit's motion and focus on Dresser-Rand's other breach of contract counterclaims, which are the subject of other motions. *Id.* at 1–2. Kiewit finally offers to withdraw the motion if Dresser-Rand stipulates to the court that it has no claim arising from "damage to the Modules." *Id.* at 2.

**B.      Analysis**

In Dresser-Rand's response to Kiewit's motion, Dresser-Rand states twice that it makes no allegations that Kiewit damaged the Modules. Dkt. 28 at 1, 7. Further, Dresser-Rand offers no argument to contravene Kiewit's assertion that a counterclaim for damage to the Modules would be barred by Article 903 of the Contract. In fact, Dresser-Rand expressly acknowledges that a counterclaim for damage to the Modules "would possibly implicate Article 903." *Id.* at 7. Despite the relatively clear statements in its briefing, Dresser-Rand was unwilling to stipulate at oral argument that it did not seek to recover for damage to the Modules. Both in its briefing and at oral argument, Dresser-Rand focused on the damages stemming from Kiewit's "defective work." Dkt. 28 at 2–5. However, the issue of Kiewit's allegedly defective work is the subject of Dresser-Rand's counterclaim under the contractual warranty, which is not at issue in this motion. Further, the Contract makes clear that any claims for defective work must be brought as warranty claims. Dkt. 52, Ex. A at Art. 803(g)-(h) (stating that Dresser-Rand's sole remedies for defective work would be those stated in the contractual warranty, and expressly foreclosing any other cause of action

7

in contract or tort based on defective work); *see also S.O.S. Salson, Inc. v. Acad. Corp.*, No. CIV.A. H-09-3145, 2010 WL 4570002, at *6 (S.D. Tex. Nov. 4, 2010) (Hoyt, J.) (explaining that a contract provision attempting to specify or limit the remedies available in the event of breach is enforceable under Texas law).

The court finds that, to the extent Dresser-Rand raises a counterclaim for damage to the Modules, Dresser-Rand has offered no evidence or legal argument in support of this counterclaim. Accordingly, Dresser-Rand has failed to raise a genuine issue of material fact for trial. Kiewit's motion for partial summary judgment on Dresser-Rand's counterclaim for damage to the Modules is GRANTED.

### IV. KIEWIT'S MOTION FOR PARTIAL SUMMARY JUDGMENT ON DRESSER-RAND'S COUNTERCLAIM FOR WARRANTY DAMAGES

**A.  Relevant Contractual Provisions**

In its counterclaim, Dresser-Rand seeks damages for the losses it experienced as a result of Kiewit's "defective work." Dkt. 3 at 7. The Contract states that the warranty outlined in Article 803 is Dresser-Rand's exclusive remedy and Kiewit's only obligation arising out of defective work. Dkt. 52, Ex. A at Art. 803(g)-(h). Article 803(a) states that Kiewit "will promptly repair, replace, or correct, at [Kiewit's] own expense any such Defects in [Kiewit's] Work forming part of the tangible product of the Work that are called to [Kiewit's] attention *in writing* by [Dresser-Rand] prior to the expiration of the Warranty Period." *Id.* at Art. 803(a) (emphasis added). Among other definitions not relevant here, the Warranty Period is defined as 18 months from "Sailaway," the date the Modules departed Kiewit's dock and were sea fastened on Dresser-Rand's transport. *Id.* at Art. 201(s), (v); *id.*, App. A at Art. 803. Article 1304 of the Contract outlines how communications between the parties must be made:

> All notices and other communications required by this Contract shall be in writing and shall be hand-delivered or sent by registered or certified mail, return receipt requested, postage prepaid, addressed to the individual and address indicated for such Party in Appendix "A" or by facsimilie to the individual and fax number indicated in Appendix "A" with a copy by regular mail.  Notice shall be perfected at the time of receipt . . . Any telephone numbers and/or email addresses listed in Appendix "A" are for convenience only, and neither telephone nor e-mail shall constitute valid means for communicating notice for purposes of this Article unless followed in writing as discussed above.

*Id.* at Art. 1304.

## B.    Parties' Arguments

On November 24, 2015, Kiewit filed a motion for partial summary judgment regarding Dresser-Rand's counterclaim for warranty damages. Dkt. 17.  Kiewit states that Dresser-Rand never provided a written notice to Kiewit of its allegedly "defective work" during the Warranty Period, as required by Articles 803 and 1304 of the Contract. Dkt. 17-1 at 2.  Kiewit argues that written notice of defects was a "condition precedent" to Dresser-Rand's right to enforce Kiewit's warranty obligation.  *Id.* at 7.  Because Dresser-Rand did not provide written notice of defects, Kiewit contends that Dresser-Rand failed to satisfy the condition precedent to invoking Kiewit's warranty obligation.  *Id.* at 9.  Therefore, Kiewit argues that it cannot be held liable for damages arising out of the warranty.  *Id.*  Further, Kiewit notes that the Contract states that Dresser-Rand's exclusive remedy for defective work is the repair, replacement, or correction of the work at Kiewit's expense. *Id.* at 10-11.  Kiewit argues that Dresser-Rand failed to avail itself of this exclusive remedy under the Contract and cannot now maintain a lawsuit for damages.  *Id.*

In response, Dresser-Rand has not disputed that it failed to strictly comply with the written notice provisions of the Contract. Dkt. 29.  Rather, Dresser-Rand argues that it was not required to strictly comply with the written notice provisions because Kiewit had actual knowledge of defects

in its work.  *Id.* at 1–2.  Dresser-Rand notes that Texas law recognizes the doctrine of "substantial compliance" with contractual notice provisions, which can excuse a party's failure to strictly comply with a notice requirement.  *Id.* at 5–6.  Dresser-Rand emphasizes that Kiewit had actual knowledge of defects in its work because Kiewit received email correspondence from Dresser-Rand and Excel personnel discussing defects in the work.  *Id.* at 2–3.  Further, Kiewit received a letter from Excel discussing the defects.  *Id.* at 4.  Dresser-Rand also points to an internal memo at Excel which documents the severity of these defects.  *Id.* at 4–5.

In reply, Kiewit does not dispute that it had actual knowledge of defects in its work.  Dkt. 39. Kiewit reiterates, however, that Dresser-Rand failed to comply with the Contract's explicit written notice requirement and that written notice is a condition precedent to Kiewit's warranty obligation. *Id.* at 3.  Kiewit emphasizes that the Contract explicitly states that email is not a valid form of notice. *Id.* at 4.  Kiewit argues that Dresser-Rand cannot have "substantially complied" with the written notice provision by providing notice via email where the Contract specifically provides that email notice is invalid.  *Id.*

## C.   Analysis

Kiewit argues that written notice of defects is a "condition precedent" to Dresser-Rand invoking Kiewit's warranty obligation.  Dkt. 17-1 at 7.  Dresser-Rand has not disputed that the Contract's notice provision is accurately characterized as a condition precedent.  Further, the Contract is clear that Kiewit's warranty obligation applies only to "any such defects . . . that are called to [Kiewit's] attention in writing by [Dresser-Rand] prior to expiration of the Warranty Period (excluding underwater Defects)."  Dkt. 52, Ex. A at Art. 803(a).  Moreover, Texas law supports Kiewit's position that a notice provision functions as a condition precedent.  *See Emerald Forest Util. Dist. v. Simonsen Constr. Co.*, 679 S.W.2d 51, 54 (Tex. App.—Houston [14th Dist.] 1984, writ

10

ref'd n.r.e.) ("When a contract provides for a particular form of notice, compliance with such provisions is a condition precedent to invoking the contract rights which are conditioned on the notice."); *see also Arbor Windsor Court, Ltd. v. Weekley Homes, LP*, 463 S.W.3d 131, 140–41 (Tex. App.—Houston [14th Dist.] 2015, pet. denied) (construing notice provision as a condition precedent to plaintiff's right to a remedy for defendant's default); *Tenn. Gas Pipeline Co. v. Technip USA Corp.*, No. 01-06-00535-CV, 2008 WL 3876141, at \*20–23 (Tex. App.—Houston [1st Dist.] Aug. 21, 2008, pet. denied) (concluding that written notice of defects was required under a contract's warranty provision, and treating compliance with the notice provision as a condition precedent for asserting a warranty claim).   Therefore, Dresser-Rand must have satisfied the Contract's notice provision in order to maintain its counterclaim for damages under the warranty.

There is no dispute between the parties that (1) Dresser-Rand did not strictly comply with the Contract's requirement that it provide written notice of defects to Kiewit during the Warranty Period and that (2) Kiewit had actual knowledge of defects in its work during the Warranty Period. Although Kiewit apparently received notice of the defects from Excel in multiple forms, the only notice provided by Dresser-Rand itself was in the form of email correspondence.  The Contract is clear that the notice must come from Dresser-Rand and not another source.  See Dkt. 52, Ex. A at Art. 803(a) (obligating Kiewit to repair those defects called to its attention "in writing *by [Dresser-Rand]*" (emphasis added)).  Therefore, the only question before the court is whether Dresser-Rand "substantially complied" with the Contract's notice provision by providing notice of defects by email.

"The doctrine of substantial compliance excuses a party's deviations from a contractual requirement, but only if those deviations do not severely impair the purpose of the requirement." *S. Tex. Elec. Co-op. v. Dresser-Rand Co.*, 575 F.3d 504, 508 (5th Cir. 2009).  The doctrine of

substantial compliance is applicable to contractual notice provisions. *Id.* at 507.  In *South Texas Electric Cooperative*, the contract at issue required the plaintiff to give the defendant written notice of any defects in the defendant's work. *Id.* at 506.  If the defendant failed to correct the defects, the plaintiff could remedy the defects itself after providing an additional ten days written notice of its intent to do so. *Id.*  The plaintiff found defects in the defendant's manufacturing work and informed the defendant of these problems. *Id.*  After the defendant failed to take action, the plaintiff employed an outside contractor to perform the repair work without providing written notice of its intent to repair the defects itself. *Id.*  The plaintiff subsequently sued the defendant to recover the amount paid to the outside contractor. *Id.*  The jury found that the plaintiff substantially complied with the contract's notice provision and awarded damages to the plaintiff. *Id.*  The defendant appealed, arguing that the district court erred in submitting the issue of substantial compliance to the jury. *Id.* at 507.  The Fifth Circuit affirmed, finding that strict compliance with the notice provision was unnecessary. *Id.* at 507–09.  However, the court indicated that a different situation would be presented if (1) the contract made failure to strictly comply with the written notice provision a basis for waiver of the right to enforce the warranty or (2) the plaintiff's failure to strictly comply with the notice provision had undercut the notice provision's central purpose. *Id.* at 507–08.

As in *South Texas Electric Cooperative*, other courts have excused a party's failure to strictly comply with a contractual notice provision. *See, e.g., Tex. Util. Elec. Co. v. Aetna Cas. & Sur. Co.*, 786 S.W.2d 792, 793–94 (Tex. App.—Dallas 1990, writ denied) (holding that defendant's notice of cancellation was effective and in substantial compliance with contract where plaintiff admitted that it had received the notice in its Mesquite office, even though the contract required that the notice be sent to the Allen office); *Barbier v. Barry*, 345 S.W.2d 557, 562 (Tex. App.—Dallas 1961, no writ) (finding that notice by letter was effective and in substantial compliance with the contract where

defendant admitted it had received the notice, even though the notice was not sent by registered mail, as required by the contract).

By contrast, other courts have found that a party waived its remedies under a contract where the party failed to comply with a written notice provision.  In *Interstate Contracting Corp. v. City of Dallas, Texas*, plaintiff Interstate Contracting Corporation ("ICC") entered into a contract to provide various services to defendant City of Dallas regarding the City's water treatment plant.  407 F.3d 708, 711 (5th Cir. 2005).  ICC notified the City that it was experiencing increased costs in connection with the  contract.  *Id.* at 711–12.  When ICC sued the City to recover these costs, the City argued that ICC's claims were barred because ICC did not comply with the process outlined in the contract requiring notice of claims for additional compensation.  *Id.* at 726.  A jury found that ICC had substantially complied with the contract's notice requirement regarding claims for additional compensation but that ICC had not strictly complied with the provisions.  *Id.* at 727.  The Fifth Circuit reversed.  *Id.*  The court noted that the contract at issue expressly required strict compliance with the notice provisions.  *Id.*  The court explained that substantial compliance excuses deviation from a contract's provisions only where substantial compliance is "the legal equivalent of compliance."  *Id.*  The court therefore held that "because the contract expressly requires strict compliance, substantial compliance is not the legal equivalent of compliance." *Id.*; *see also Emerald Forest Util. Dist.*, 679 S.W.2d at 54 (holding that, where contract required the contractor to notify the owner and engineer in writing of any subsurface or latent physical conditions at the work site, oral notice was ineffective and the contractor was liable for resulting damages).

In order to deny Kiewit's motion, the court would need to find that Dresser-Rand "substantially complied" with the Contract's notice provisions by providing notice of defects in Kiewit's work by email.  However, the Contract explicitly provides that email is *not* an effective

13

form of notice.  Dkt. 52, Ex. A at Art. 1304 ("All notices and other communications required by this Contract shall be in writing and shall be hand-delivered or sent by registered or certified mail, return receipt requested, postage prepaid . . . [N]either telephone nor e-mail shall constitute valid means for communicating notice for purposes of this Article unless followed in writing as described above.").  If the court were to find that notice by email is the substantial equivalent of written notice, the court would effectively remove the Contract's clear prohibition of notice by email.  The court cannot simply read this provision out of the Contract because the court must read the Contract so that no provision is rendered meaningless.  *Valence Operating Co.*, 164 S.W.3d at 662.  The parties clearly intended for email notice to be ineffective, and the court's primary obligation is to enforce the intentions of the parties.  *Id.*

This case is comparable to the *Interstate Contracting Corp.* case discussed above, where the Fifth Circuit found that substantial compliance could not be considered the equivalent of strict compliance where the contract expressly required strict compliance.  407 F.3d at 727.  Similarly, here, the court cannot find that notice by email constitutes the "legal equivalent of compliance" where the Contract unambiguously states that email notice is invalid and is not a substitute for written notice.  Therefore, the court finds that Dresser-Rand did not substantially comply with the notice provisions of the Contract.  Because Dresser-Rand failed to provide effective notice of defects to Kiewit, Dresser-Rand failed to satisfy a condition precedent to Kiewit's warranty obligations. Accordingly, Kiewit's warranty obligations were not triggered, and Dresser-Rand failed to exercise its exclusive remedy for defective work under the Contract.  *See Tenn. Gas Pipeline Co.*, 2008 WL 3876141, at *21 (finding that plaintiff failed to provide written notice of defective work to defendant contractor as required by the contract, and therefore plaintiff "failed to avail itself of its exclusive

remedy" for defective work under the contract).  Therefore, Kiewit's motion for partial summary judgment on Dresser-Rand's counterclaim for warranty damages is GRANTED.

### V.  KIEWIT'S MOTION FOR PARTIAL SUMMARY JUDGMENT ON DRESSER-RAND'S COUNTERCLAIM FOR LIQUIDATED DAMAGES

#### A.     Parties' Arguments

In its counterclaim, Dresser-Rand seeks to recover for the liquidated damages that PEMEX has assessed against Dresser-Rand due to Kiewit's alleged failure to timely and properly perform. Dkt. 3 at 7.  On November 24, 2015, Kiewit filed a motion for partial summary judgment on Dresser-Rand's counterclaim for these liquidated damages.  Dkt. 19.  Kiewit argues that the liquidated damages PEMEX has assessed against Dresser-Rand are "consequential damages," and Dresser-Rand has waived these damages under Article 909 of the Contract.  Article 909 provides:

> **[Dresser-Rand] and [Kiewit] each hereby waive any and all Claims it may have against the other for consequential, special, punitive, or indirect damages, including but not limited to lost profits or business interruption, however same may be caused. The term "consequential damages" includes, but is not limited to, loss of production, loss of profits, loss of business, and loss of use. [Dresser-Rand's] sole and exclusive remedy under this Contract, at law, or otherwise in respect of delays shall be the payment of liquidated damages as described in Appendix "A," which by definition includes any consequential and/or indirect damages suffered by [Dresser-Rand, its affiliates, its client, contractors, and suppliers].**

Dkt. 52, Ex. A at Art. 909.  Kiewit emphasizes that the liquidated damages that Dresser-Rand seeks to recover in its counterclaim arise out of the Purchase Order between PEMEX and Dresser-Rand, to which Kiewit is not a party.  Dkt. 19-1 at 8–9.  Kiewit argues that, under Texas law, penalties arising under separate contracts are consequential damages as a matter of law.  *Id.*  Therefore, Kiewit contends that the liquidated damages arising out of the contractual relationship between PEMEX and Dresser-Rand are consequential in nature.  *Id.* at 9.  Because Dresser-Rand expressly waived

15

consequential damages under the Contract, Kiewit claims that Dresser-Rand cannot maintain its counterclaim for liquidated damages. *Id.*

In response, Dresser-Rand points out that Kiewit knew from the inception of the Project that the Modules were ultimately intended for PEMEX under the Purchase Order. Dkt. 30 at 2. Dresser-Rand also cites to testimony indicating that Kiewit became aware that Dresser-Rand faced liquidated damages from PEMEX. *Id.* at 2–3. Dresser-Rand argues that it was foreseeable to Kiewit that Dresser-Rand would be assessed liquidated damages by PEMEX if Kiewit breached its obligations to Dresser-Rand. *Id.* at 4. Because these liquidated damages were foreseeable to Kiewit, Dresser-Rand concludes that the damages are appropriately characterized as "direct" damages that are recoverable under the Contract. *Id.* at 4–6.

In reply, Kiewit argues that Dresser-Rand inappropriately suggests that "pure foreseeability" is the standard to determine whether actual damages are consequential or direct. Dkt. 40 at 1. However, Kiewit notes that foreseeability is a requirement for recovery of both direct and consequential damages. *Id.* at 1–2. Therefore, Kiewit argues that the fact the liquidated damages assessed by PEMEX may have been foreseeable is immaterial to determining whether the damages are direct or consequential. *Id.* at 3. Further, Kiewit contends that it is well established that losses arising from collateral contracts, like the Purchase Order, are considered consequential damages as a matter of law. *Id.* at 4–5. Kiewit also emphasizes that the consequential damages waiver in the Contract expressly excludes claims for lost profits, and Kiewit argues that Dresser-Rand's liquidated damages counterclaim is fundamentally a claim for profits lost on the Purchase Order. *Id.* at 2.

## B.    Analysis

On a breach of contract claim, Texas law permits recovery for "actual damages" sustained. *BCC Merch. Sols., Inc. v. Jet Pay, LLC*, 129 F. Supp. 3d 440, 473 (N.D. Tex. 2015). To recover

16

actual damages, "the plaintiff must establish that its damages are 'the natural, probable, and foreseeable consequence of the defendant's conduct.'" *Id.* (quoting *Mead v. Johnson Grp., Inc.*, 615 S.W.2d 685, 687 (Tex. 1981)). The foreseeability analysis focuses on the time when the contract was made. *Mead*, 615 S.W.2d at 687 (citing *Hadley v. Baxendale*, 9 Exch. 341, 354 (1854)); *see also* Restatement (Second) of Contracts § 351 (Am. Law. Inst. 1981) ("Damages are not recoverable for loss that the party in breach did not have reason to foresee as a probable result of the breach when the contract was made."). Actual damages may be either "direct" or "consequential." *Arthur Andersen & Co. v. Perry Equip. Corp.*, 945 S.W.2d 812, 816 (Tex. 1997). "Direct damages are the necessary and usual result of the defendant's wrongful act; they flow naturally and necessarily from the wrong. Direct damages compensate the plaintiff for the loss that is conclusively presumed to have been foreseen by the defendant from his wrongful act." *Id.* (citations omitted). By contrast, consequential damages "result naturally, but not necessarily, from the defendant's wrongful acts." *Id.* Consequential damages "need not be the usual result of the wrong, but must be foreseeable, and must be directly traceable to the wrongful act and result from it." *Id.* Consequential damages "require the existence of some other fact (known or unknown) beyond the relationship between the parties." *Powell Elec. Sys., Inc. v. Hewlett Packard Co.*, 356 S.W.3d 113, 119 (Tex. App.—Houston [1st Dist.] 2011, no pet.).

Kiewit is correct that all actual damages must be foreseeable in order to be recoverable, regardless of whether the damages are direct or consequential. *See Mead,* 615 S.W.2d at 687. Therefore, the court will first address whether the liquidated damages assessed by PEMEX were foreseeable to Kiewit and then address whether the liquidated damages are appropriately characterized as direct or consequential.

1.      **Foreseeability**

It is clear that, at all times, Kiewit was aware that the Modules were intended for PEMEX. Kiewit's initial proposal to Dresser-Rand references the Project as the "PEMEX Litoral Gas Compression Project." *See* Dkt. 30, Ex. 1, Dep. Ex. 37. However, Dresser-Rand has produced no evidence that, at the time of contracting, Kiewit was aware of the liquidated damages clause in the Purchase Order. Kiewit produced uncontroverted affidavit testimony that it received a copy of the Purchase Order for the first time through the discovery process in this litigation. *See* Dkt. 40, Ex. A. The Contract itself makes no mention of Dresser-Rand's liquidated damages obligation to PEMEX. Further, the evidence that Dresser-Rand has produced merely indicates that Kiewit became aware of Dresser-Rand's liquidated damages obligation to PEMEX at some point during the pendency of the Project. *See* Dkt. 30, Ex. 2, Dep. Ex. 177 (email from Kiewit's project manager sent September 30, 2013, eight months after the Contract was formed, referencing Dresser-Rand's liquidated damages obligation to PEMEX); Dkt. 30, Ex. 2 at 325–26 (testimony from Kiewit's project manager, discussing this email); Dkt. 30, Ex. 3 at 31 (testimony from Kiewit's area manager, stating that Dresser-Rand elected to accept delivery of the Modules before all work on the Modules was complete because Dresser-Rand had a liquidated damages condition). Dresser-Rand has identified no evidence in the record establishing that Kiewit was aware of the liquidated damages clause in the Purchase Order at the time the Contract was formed. Accordingly, Dresser-Rand has failed to show that Dresser-Rand's liquidated damages obligation to PEMEX was foreseeable to Kiewit. Therefore, regardless of whether the liquidated damages are considered direct or consequential, Dresser-Rand cannot recover.

The court in *Longview Construction and Development v. Loggins Construction Co.* faced a similar situation and reached the same conclusion. 523 S.W.2d 771 (Tex. App.—Tyler 1975, writ

dism'd).  The plaintiff sought to recover for a liquidated damages penalty assessed against it by a third party under a collateral contract as a result of the defendant's delays.  *Id.* at 777.  The court explained that

> [i]t is the general rule that losses resulting from collateral contracts may not be regarded as arising out of breach of the contract upon which the action is founded.  The basis of this rule is that such damages are not presumed, as a matter of law, to have been in the contemplation of the parties.  In order for an injured party to recover from a defaulting party, the amount of damages which he has been required to pay to a third party as a result of his breach, the injured party must establish that the defaulting party, at the time he entered into the contract, had knowledge of the special circumstances producing such damages.  The parties are not presumed to know the condition of each other's affairs nor to take into account the provisions of a contract with a third party that is not known or communicated.

*Id.* at 777–78 (citations and internal quotation marks omitted).  The court found that the plaintiff had failed to prove that the defendant had actual knowledge of the liquidated damages provision in the collateral contract at the time the contract was formed.  *Id.* at 778.  Therefore, the court found that the plaintiff could not recover for the liquidated damages penalty.  *Id.*  Similarly, here, Dresser-Rand has presented no evidence that Kiewit was aware of the liquidated damages provision in the Purchase Order at the time the Contract was formed.  Accordingly, Dresser-Rand cannot hold Kiewit responsible for the liquidated damages assessed by PEMEX.

### 2. Direct or Consequential

Even if the court assumes that the liquidated damages assessed by PEMEX were sufficiently foreseeable to Kiewit to be recoverable, courts in several analogous situations have found that damages arising under a collateral contract are consequential in nature.  In *BCC Merchant Solutions, Inc. v. Jet Pay, LLC*, plaintiff BCC entered into a Master Service Agreement ("MSA") with defendant JetPay.  *BCC Merch. Sols., Inc. v. Jet Pay, LLC*, 129 F. Supp. 3d 440, 461 (N.D. Tex.

2015).   Under the MSA, JetPay was responsible for helping BCC process and keep track of its

financial transactions with its merchants.   *Id.* at 461–62.   However, JetPay ultimately failed to

accurately process and report the merchant transactions.   *Id.* at 462.   As a result of JetPay's failures,

several dissatisfied merchants terminated their relationships with BCC.   *Id.* at 463.   BCC brought

suit to recover for the profits lost on these relationships.   *Id.*   Under the MSA, the parties agreed to

waive claims against each other for consequential damages.   *Id.* at 472–73.   Therefore, the court

considered whether BCC's damages stemming from the loss of its merchant relationships were direct

or consequential.   The court found that these damages were consequential and explained:

> Here, BCC's lost profits do not constitute direct losses on the MSA
> itself, but instead, are consequential losses on other contracts or
> relationships resulting from the breach.  Despite BCC's protestations,
> it does not matter whether BCC's profits on merchant accounts were
> its primary benefit of the bargain expectations, unless such
> expectations were actually reflected in the MSA such that any loss of
> these profits would flow naturally and necessarily from JetPay's
> breach . . . here, the MSA merely refers sporadically to BCC's
> merchant accounts, without providing any sort of measure of damages
> that BCC may collect in the event JetPay's unreasonably-performed
> services cause BCC to lose profits on these third party agreements.
> And while the MSA's references to BCC's merchant accounts may
> have rendered the lost profits foreseeable, nothing in the MSA
> actually demonstrates that the lost profits were a necessary by-product
> of JetPay's breach. Instead, BCC's lost profits flowed necessarily
> from BCC's third-party agreements, and were only an indirect
> consequence of JetPay's failure to perform in a commercially
> reasonable manner.

*Id.* at 476 (citations and internal quotation marks omitted).   This case is similar to *BCC Merchant*

*Solutions* in several important aspects.   Like the losses in *BCC Merchant Solutions*, the liquidated

damages in this case do not arise directly from the Contract; rather, the liquidated damages stem

from a third-party contract.   Further, although servicing PEMEX may have been the primary purpose

of the Contract, the Contract makes no reference to damages that may be assessed by PEMEX in the

event of Kiewit's failure to perform.  Therefore, even assuming that the liquidated damages were

foreseeable, there is nothing in the Contract to demonstrate that liquidated damages would be a

"necessary by-product" of Kiewit's breach.  *See also El Paso Mktg., L.P. v. Wolf Hollow I, L.P.*, 383

S.W.3d 138, 144 (Tex. 2012) ("Although Wolf Hollow argues that its replacement-power damages

are direct, not consequential, these damages derive entirely from the agreements Wolf Hollow has

with its customers and thus do not flow necessarily from plant shutdowns due to gas supply

problems.").  Accordingly, the liquidated damages are only an "indirect consequence" of Kiewit's

alleged failure to perform.

Other courts have reached the same conclusion as the *BCC Merchants Solutions* court when

specifically considering the subject of fees and penalties assessed pursuant to third-party contracts.

*See Balfour Beatty Rail Inc. v. Kan. City S. Ry. Co.*, No. 3:10-CV-1629-L, 2012 WL 3100833, at *19

(N.D. Tex. July 31, 2012) (holding that defendant's counterclaim to recover fees paid to third party

as a result of plaintiff's delays was barred by the contract's consequential damages waiver, and

explaining that the court could not conclude that the fees paid to the third party were "conclusively

presumed to have been foreseen or contemplated" by the plaintiff as a result of its failure to timely

complete the project); *Tenn. Gas Pipeline Co.*, 2008 WL 3876141, at *11 ("[E]ven if Technip's

conduct constituted a breach of the Contract, we conclude that TGP's damage is indirect or

consequential because it involves a relationship outside of the Contract between TGP and Technip;

namely, this claim involves a penalty TGP owes under its contract with its utility company.").

Similarly, in this case, the liquidated damages assessed by PEMEX stem solely from the third-party

contract between PEMEX and Dresser-Rand.  Therefore, these damages depend entirely on a fact

"beyond the relationship between the parties." *Powell Elec. Sys., Inc.*, 356 S.W.3d at 119.  The court

cannot conclude that the liquidated damages assessed by PEMEX pursuant to the Purchase Order

were "conclusively presumed to have been foreseen by" Kiewit as a result of its alleged failure to timely and properly perform.  Accordingly, the liquidated damages are appropriately classified as consequential damages and have been waived under Article 909 of the Contract.

Because the liquidated damages assessed by PEMEX were not foreseeable to Kiewit at the time of contracting and because the liquidated damages are consequential in nature, Kiewit's motion for partial summary judgment on Dresser-Rand's counterclaim for warranty damages is GRANTED.

## VI.  KIEWIT'S MOTION FOR PARTIAL SUMMARY JUDGMENT ON PAYMENT OF INVOICE DR-07

### A.  Background

During the load-out of the Modules, Dresser-Rand informed Kiewit that PEMEX had decided to use a different lift rigging system for setting the Modules than initially planned.  Dkt. 22, Ex. A at 3.  Dresser-Rand requested that Kiewit provide engineering analysis related to this new rigging system.  *Id.*  Because this engineering analysis was outside of Kiewit's original "Scope of Work" under the Contract, Dresser-Rand's request for this analysis was documented in a "Change Order Request" pursuant to Article 303 of the Contract.  *Id.*  On March 20, 2014, Kiewit and Excel executed Change Order No. 22 for this additional work.  *Id.*  On March 21, 2014, Change Order No. 22 was approved by Dresser-Rand.  *Id.*; *see also* Dkt. 23, Ex. A-4.  Excel performed the work requested in Change Order No. 22.  Dkt. 22, Ex. A at 3.  On May 19, 2014, Kiewit submitted Invoice DR-07 to Dresser Rand.  *Id.* at 4.  Invoice DR-07 is based exclusively on the engineering services reflected in Change Order No. 22.  *Id.*  On June 17, 2014, Dresser-Rand issued a formal notice to Kiewit, indicating that it disputed  the charges in Invoice DR-07 because "the method used to compute the invoice value is not in compliance with the milestone payment process described in contractual Appendix A."  Dkt. 23, Ex. A-6.

### B.     Parties' Arguments

On November 25, 2015, Kiewit filed a motion for partial summary judgment on payment of Invoice DR-07.  Dkt. 22.  Kiewit argues that Dresser-Rand lacks any contractual basis to deny payment of Invoice DR-07; therefore, Dresser-Rand's refusal to pay this invoice is a clear breach of the Contract.  *Id.* at 2.  Kiewit points out that there is no dispute that Dresser-Rand requested the work reflected in Invoice DR-07, that the work was actually performed, and that Kiewit incurred the charges reflected in the invoice. *Id.* at 9.

In response, Dresser-Rand argues that Kiewit breached the Contract by performing defective and inefficient work that caused the price of the Contract to increase substantially.  Dkt. 31 at 2, 6, 8.  Therefore, as a result of Kiewit's alleged breaches of the Contract, Dresser-Rand argues that it was excused from any further performance under the Contract, including its obligation to pay Invoice DR-07.  *Id.* at 7–8.

In reply, Kiewit points out that the breaches alleged by Dresser-Rand occurred before Sailaway. Dkt. 41 at 1–2.  However, the work reflected in Invoice DR-07 occurred post-Sailaway and was requested, approved, and accepted by Dresser-Rand.  Dkt. 41 at 1.  Kiewit argues that its alleged breaches of the Contract would excuse Dresser-Rand of performance under the Contract *only* if Dresser-Rand treated the Contract as terminated going forward.  *Id.* at 2.  However, Kiewit points out that Dresser-Rand did not treat the Contract as terminated after Kiewit's alleged pre-Sailaway breaches; rather, Dresser-Rand continued to request work from Kiewit and demand Kiewit's continued performance, as documented in Change Order No. 22.  *Id.*  Further, Kiewit emphasizes that Dresser-Rand has not alleged that the work reflected in Invoice DR-07 was non-conforming or untimely.  *Id.* at 4.

## C.    Analysis

Dresser-Rand has not alleged that Kiewit breached the Contract in any way that relates to the work reflected in Invoice DR-07.   Further, Dresser-Rand has not disputed that it requested and approved the additional work reflected in Invoice DR-07 through the Contract's change order procedure.   Therefore, the only question before the court is whether Dresser-Rand may rely on Kiewit's previous alleged breaches of the Contract to excuse its obligation to pay for the subsequent, unrelated work reflected in Invoice DR-07.

The court in *Henry v. Mason* explained in detail the principles underlying the excuse raised by Dresser-Rand:

> It is a fundamental principle of contract law that when one party to a contract commits a material breach of that contract, the other party is discharged or excused from further performance.  However, if, after the breach, the non-breaching party continues to insist on performance by the party in default, the previous breach constitutes no excuse for nonperformance on the part of the party not in default and the contract continues in force for the benefit of both parties.  The non-breaching party must thus elect between two courses of action—continuing performance under the contract or ceasing to perform.
>
> If the non-breaching party treats the contract as continuing after the breach, he is deprived of any excuse for terminating his own performance.  The election affects only whether the non-breaching party is required to perform fully after the breach.
>
> Seeking to benefit from the contract after the breach operates as a conclusive choice depriving the non-breaching party of an excuse for his own non-performance.  If the non-breaching party elects to treat the contract as continuing after a breach and continues to demand performance, it obligates itself to perform fully.

333 S.W.3d 825, 840–41 (Tex. App.—Houston [1st Dist.] 2010, pet. denied) (citations and internal quotation marks omitted); *see also Hous. Belt & Terminal Ry. Co. v. J. Weingarten, Inc.*, 421 S.W.2d 431, 436 (Tex. App.—Houston [1st Dist.] 1967, writ ref'd n.r.e.) (noting that, where the non-

breaching party continues to insist on performance of the contract after the breach, it loses its excuse to avoid its own performance but it retains its cause of action for damages for breach of contract).

Numerous courts have applied these principles and denied the non-breaching party its excuse for non-performance where it has treated the contract as ongoing or demanded continued performance from the breaching party.  *See Henry*, 333 S.W.3d at 841–42  (holding that the plaintiff's decision to treat a settlement agreement as ongoing after the defendant's breach by accepting the benefit of the defendant's performance deprived the plaintiff of any excuse to avoid its own performance); *see also Long Trs. v. Griffin*, 222 S.W.3d 412, 415–16 (Tex. 2006) (holding that, where the parties agreed to share the costs of litigation against a third party, the non-breaching party was required to pay its share of the costs because it accepted its share of the lawsuit recovery, thereby receiving the benefit of the bargain and waiving its excuse for non-performance); *Hanks v. GAB Bus. Servs., Inc.*, 644 S.W.2d 707, 708 (Tex. 1982) (holding that, where the non-breaching party treated a contract for sale of a business as ongoing by retaining all assets of the business and continuing its operation, the non-breaching party waived its right not to perform based on the other party's breach of the covenant not to compete); *Gupta v. E. Idaho Tumor Inst., Inc.*, 140 S.W.3d 747, 757–58 (Tex. App.—Houston [14th Dist.] 2004, pet. denied) (explaining that, because the non-breaching party continued to demand the breaching party's performance under joint venture agreement, the non-breaching party was obligated to perform under the agreement).

In this case, Dresser-Rand clearly waived any excuse for its non-payment of Invoice DR-07. Despite Kiewit's multiple alleged breaches of the Contract, Dresser-Rand not only elected to treat the Contract as continuing but actively requested additional work from Kiewit pursuant to Change Order No. 22.  By demanding additional performance from Kiewit, Dresser-Rand continued to seek benefits under the Contract and therefore made the "conclusive choice depriving [itself] of an excuse

for [its] own non-performance." *Henry*, 333 S.W.3d at 841.  Dresser-Rand has raised no other

defense to its non-payment of Invoice DR-07.  Dresser-Rand requested the work in Invoice DR-07

and accepted the benefit of the work;  it must compensate Kiewit accordingly.  Kiewit's motion for

partial summary judgment on payment of Invoice DR-07 is GRANTED.

### VII.  DRESSER-RAND'S MOTION FOR SUMMARY JUDGMENT ON KIEWIT'S COMPLAINT

On February 26, 2016, Dresser-Rand filed a motion for summary judgment on Kiewit's

complaint. Dkt. 46.  The motion addresses (1) Kiewit's claims for payment pursuant to invoices DR-

04B, 05, and 06; (2) Kiewit's claim for losses resulting from Dresser-Rand's alleged failure to timely

provide information regarding the Modules (the "Project Impact Damages" claim); and (3) Kiewit's

quasi-contractual claims for unjust enrichment and promissory estoppel.  The court will first outline

the key provisions in the Contract applicable to this motion.  The court will then address each sub-

section of Dresser-Rand's motion in turn.

**A.     Relevant Contractual Provisions**

**1.     Definitions**

Article 201 of the Contract defines several terms that are relevant to Dresser-Rand's motion.

*See* Dkt. 52, Ex. A at Art. 201. "Contract Price" is defined as "the full and complete compensation

described in Article 701 to be paid to [Kiewit] for the Work in accordance with the Milestones, as

may be modified by Change Order(s), if any." *Id.* at Art. 201(j).  "Work" is defined as

> providing fabrication of and/or design and engineering services for
> the [Modules] required of [Kiewit] in the Contract Documents, as
> well as any materials, equipment, and other items to be supplied by
> [Kiewit] for incorporation into the [Modules].  Unless the context
> clearly indicates otherwise, the term "Work" herein includes Work
> under a Change Order, which may also be referred to as "Change
> Order Work."

26

*Id.* at Art. 201(w).  "Change Order" is defined as

> any written document on the form attached hereto as Appendix "C,"
> executed by both parties, that specifies a change in the Specifications
> or in the Scope of Work, or a modification in, a deduction from, an
> addition to, or other modification to the Work, with mutually agreed
> adjustments to the Contract Price and/or Scheduled Completion Date,
> as applicable.

*Id.* at Art. 201(b).  "Scope of Work" is defined as "the Specifications and other particulars of the

Work set forth in the Scope of Work attached as Appendix 'E.'"  *Id.* at Art. 201(q).

### 2.      Provisions Regarding the Contract Price

Compensation is discussed in detail in Article 701 of the Contract, which states that

> [Dresser-Rand] shall pay [Kiewit] the Contract Price set forth in
> Appendix "A" as full consideration for the Work hereunder, as may
> be modified from time to time as a result of Change Order(s).  The
> Contract Price shall be invoiced in accordance with Appendix "A,"
> and Change Order Work shall also be invoiced as described in
> Appendix "A."   Payment of any statement or invoice shall not
> prejudice the right of [Dresser-Rand] to question the correctness of
> any charges therein.

Dkt. 52, Ex. A at Art. 701(a).  Appendix A states that the "Contract Price before Change Orders"

will be $27,271,336.  *Id.*, App. A at Art. 701(a).  Appendix A further states that "[Kiewit] shall

invoice [Dresser-Rand] in accordance with the following milestone payment schedule . . ." *Id.*, App.

A at Art. 701(b).  Appendix A then provides a table that lists five milestone events, an "approximate

milestone value" associated with each event, and an approximate date of completion of the

milestone.  *Id.*  For example, the first milestone event is described as "Mobilization (2)" and has an

"approximate milestone value" of $4,090,700 and an "approximate milestone date" of March 24,

2013.  *Id.*  The five approximate milestone values total to $27,271,336.  The first note to the table

states that "Approximate milestone values are based on the target estimate.  Actuals will invoice

based on engineering drawings and quantities."  *Id.*

27

Table 1 to Appendix E provides additional details regarding the pricing structure of the Contract. *Id.*, App. E at Tbl. 1. Table 1 separates Kiewit's tasks into different "disciplines" (e.g., engineering, procurement, sea fastening). *Id.* Each discipline is priced according to a particular "commercial mechanism"—lump sum, provisional lump sum (cost plus a percentage markup), unit rate, or time and materials. *Id.*

**3.    Change Order Process**

The Change Order process is outlined in Article 303:

> A.  At any time during the progress of the Work, either [Dresser-Rand] or [Kiewit] may propose Change Orders. Notwithstanding anything to the contrary herein, [Kiewit] shall be entitled to a Change Order making necessary and reasonable adjustments to the Contract Price and the Scheduled Completion Date solely and to the extent reasonably necessary resulting from impacts to the Work resulting from events beyond [Kiewit's] control including, without limitation:
>> (i)  Changes in the Scope of Work;
>> . . .
>> (iii) [Dresser-Rand]-caused delays;
>> (iv) Breach of [Dresser-Rand's] obligations under this Contract
>> . . .
>> (vi) Negative impacts to the Work or Scheduled Completion Date resulting from [Dresser-Rand]-Supplied Items (including late delivery, incomplete, non-conforming or defective equipment; failure to meet design requirements, codes, or laws; repair or replacement; and warranty work);
>> . . .
> E.  If [Kiewit] is impacted by an occurrence for which it claims constitutes an entitlement to a Change Order, it shall promptly notify [Dresser-Rand], but no later than fifteen (15) days, after it becomes aware of such occurrence. [Kiewit] shall quantify such impacts as soon as reasonably practicable after such notice is provided.

*Id.* at Art. 303; *see also id.*, App. C (change order form).

**B.  Kiewit's Claims under Invoices DR-04B, 05, and 06**

**1.     Parties' Arguments**

Dresser-Rand argues that it is not required to pay Invoices DR-04B, 05, and 06 because Kiewit failed to submit a Change Order for the work reflected in those invoices, as required by Article 303 of the Contract.  Dkt. 46 at 6.  Dresser-Rand emphasizes that the Contract references a Contract Price of $27,271,336, yet Kiewit invoiced Dresser-Rand for more than $10 million above that price without submitting a Change Order.  *Id.*  Dresser-Rand notes that Article 303 of the Contract explicitly requires Change Orders for "Changes in the Scope of Work."  *Id.* at 13–14. Dresser-Rand cites to emails, documents, and testimony from Excel indicating that it experienced scope changes on the Project.  *Id.* at 7–9.  Dresser-Rand argues that Kiewit cannot bring a claim to recover for adjustment of the Contract Price where it failed to follow the Contract's written Change Order procedure.  *Id.* at 14.

In response, Kiewit emphasizes that the stated Contract Price of $27,271,336 is explicitly referred to as a "target estimate" based on five "approximate milestone values." Dkt. 52 at 4.  Kiewit explains that the "target estimate" is based on different disciplines of work to be performed in accordance with particular pricing mechanisms.  *Id.*  Kiewit notes that only a small portion of the work was priced on a lump-sum basis—most of the disciplines were to be compensated on a reimbursable basis (e.g., cost plus, unit rate, and time and materials pricing).  *Id.*  Therefore, Kiewit explains that the prices associated with these disciplines were merely estimates that would be invoiced later based on actual costs incurred.  *Id.*  Kiewit notes that the Contract contains "no definitive, guaranteed, not-to-exceed, fixed, or capped price on [Kiewit's] cost of performance." *Id.* at 5.  Kiewit argues that, because Dresser-Rand agreed to pricing mechanisms based on actual costs incurred, Dresser-Rand accepted the risk of increased costs.  *Id.*  Kiewit maintains that it merely

invoiced Dresser-Rand based on actual costs.  *Id.*  Kiewit emphasizes that Dresser-Rand extensively audited Kiewit's invoices and found them to be accurate.  *Id.* at 5–6.

Further, Kiewit argues that the "Scope of Work" in the Contract never changed.  *Id.* at 6. Kiewit  contends that the Scope of Work is very broadly defined in the Contract—essentially, the Modules were "black boxes" that could be built as Kiewit saw fit, provided the Modules complied with certain basic design parameters.  *Id.*  Kiewit notes that Dresser-Rand's project manager testified that there would be no reason for Kiewit to submit a Change Order merely because of an increase in quantities needed to perform the same Scope of Work.  *Id.* at 10.  Kiewit argues that Dresser-Rand has attempted to conflate Excel's scope of work with Kiewit's Scope of Work—however, Excel's scope of work was governed by different standards articulated in its subcontract with Kiewit.  *Id.* at 11.  Therefore, Kiewit concludes, changes in scope for Excel under the subcontract are not evidence that Kiewit's Scope of Work changed.  *Id.* at 12.  Kiewit also emphasizes that Dresser-Rand paid over $33 million to Kiewit under the first four invoices, an amount substantially above the $27 million Contract Price. *Id.* at 14.  Kiewit notes that Dresser-Rand paid this amount without requiring a Change Order, thus undermining its position that an increase in cost requires a Change Order.  *Id.*

In reply, Dresser-Rand argues that Kiewit ignores the explicit Change Order procedure in the Contract.  Dkt. 55 at 1.  Dresser-Rand contends that Excel performed the full scope of engineering work under the Contract; therefore, by definition, an increase in scope for Excel was an increase in the Scope of Work under the Contract.  *Id.* at 2.  Dresser-Rand further argues that, although the Contract contemplates the possibility of an increase in the Contract Price, any increase should not so greatly exceed the stated Contract Price that the Contract Price is rendered irrelevant.  *Id.*

### 2.   Analysis

It is undisputed that Kiewit did not submit Change Orders for the work reflected in Invoices

DR-04B, 05, and 06 and that the invoices accurately reflect the costs Kiewit incurred.  Therefore, the only question before the court is whether the costs reflected in these invoices constituted a change in the Scope of Work that would require a Change Order under the Contract.  In support of its position that the Scope of Work increased under the Contract, Dresser-Rand relies heavily on testimony from employees of Excel and other documents obtained from Excel indicating that Excel experienced changes in its scope of work.  *See* Dkt. 46 at 7–9.  The court agrees with Kiewit, however, that changes in Excel's scope of work are not necessarily indicative of changes in Kiewit's Scope of Work.  "Scope of Work" is a defined term with a particular meaning in the Contract.  *See* Dkt. 52, Ex. A at 201(q).  The Scope of Work is outlined in detail in Appendix E to the Contract. *See id.*, App. E.  Therefore, even assuming that Excel's scope of work changed under its subcontract with Kiewit, that does not establish that the "Scope of Work" changed as that term is defined in Appendix E to the Contract.

Dresser-Rand also cites to additional testimony from Kiewit's president, indicating that the growth of the Project was larger than expected and that the Project differed from the "original plan." Dkt. 46 at 6–7.  However, this testimony makes no mention of the concept of the "Scope of Work," and Dresser-Rand has not attempted to connect these alleged differences from the "original plan" to any provision in Appendix E.  It is beyond dispute that the Project ultimately cost more to complete than the parties originally estimated—the issue is whether any of those cost increases were associated with a change in the Scope of Work.  In its motion, Dresser-Rand fails to identify any section of Appendix E that was altered throughout the course of the Project.  In fact, it provides no detailed analysis of Appendix E at all.

Dresser-Rand further argues that the increases in cost were so significant that the ultimate cost was far beyond what the parties contemplated.  Dkt. 55 at 2.  However, as Kiewit has pointed

out, the Contract contains no "not to exceed" price limiting the amount Dresser-Rand is obligated to pay.  In fact, a plain reading of the Contract indicates that Dresser-Rand accepted the risk that certain costs under the Contract would increase.  As Kiewit has noted, the majority of work disciplines in the Contract were *not* to be billed on a lump sum basis.  *See* Dkt. 52, Ex. A, App. E at Tbl. 1 (noting that various disciplines would be billed on unit rate, "cost plus," and time and materials bases).  Therefore, by definition, the expenses associated with these disciplines could vary based on the actual costs incurred by Kiewit and the actual time spent completing the work.  Further, the Contract Price was the sum of five "*approximate* milestone values." *Id.*, App. A at Art. 701; *see also id.* ("Approximate milestone values are based on the target estimate.  Actuals will invoice based on engineering drawings and quantities").  Given this structure, the Contract Price can increase, even without changes in the Scope of Work.  As an example, for a discipline billed on a "time and materials" basis, Dresser-Rand accepted the risk that the cost of the materials could increase beyond what it expected.  However, a mere increase in cost of materials, though it would cause a corresponding increase in the Contract Price, does not constitute a change in the Scope of Work.  Dresser-Rand's project manager, Kenneth DeVito, confirmed this understanding of the Contract and indicated that Kiewit should not submit Change Orders for mere increases in cost:

> Q.  Quantity increases or hour increases for original scope of work was not considered a scope change.
> A.  That's true.
> Q.  And if the hours increased due to, as you say, misunderstanding of scope, misestimating of productivity, that still was not a change, but it's just in the original hours to do original scope of work.
> A.  That was in their actual hours to do original scope.
> . . .
> Q.  What about unapproved changes?  Would those go in with the actuals, that - - that line?

32

> A.  Yes. They would, because what I was alluding to here that the ones that I'm not approving, I'm stating that this has to be due to misunderstanding of scope, misestimating, productivity or whatever. I didn't care.
> Q.  Right.
> A.  It wasn't a scope change and I don't care what it takes for you to do the original scope.
> Q.  So, in other words, you were telling them, don't send me a change order for performing the original scope of work?
> A.  That's right.

Dkt. 52, Ex. D at 281–82 (Deposition of Kenneth DeVito) (discussing emails sent by DeVito).

DeVito's testimony establishes that he did not consider pure cost overages to constitute a change in the Scope of Work and indicates that he refused to accept Change Orders for these increases in cost. *See also id.* at 280 (discussing an email where DeVito stated that "tasks experiencing overages other than due to scope change will not be approved as a [Change Order]").

Dresser-Rand has not established that the work reflected in Invoices DR-04B, 05, and 06 reflected a change in the Scope of Work that required a Change Order under the Contract.  Dresser-Rand has failed to identify any changes in the Scope of Work that occurred throughout the Project. The mere fact that the Project cost more than expected is consistent with the Contract's provisional pricing structure and, on its own, is not indicative of a change in the Scope of Work.  Accordingly, Dresser-Rand has not established that the Contract bars Kiewit's claims for compensation under Invoices DR-04B, 05, and 06, and Dresser-Rand's motion for summary judgment is DENIED with respect to those claims.

## C.  Kiewit's Project Impact Damages Claim

Kiewit's Project Impact Damages claim is based on its allegations that Dresser-Rand

> failed to timely provide the detailed information [Kiewit] and its engineering subcontractor, Excel, required to complete the Modules. This breach delayed and disrupted [Kiewit's] work, and negatively affected [Kiewit's] planned work sequence.  Nevertheless, Dresser-

> Rand continued to demand [Kiewit's] timely performance.   In
> response to Dresser-Rand's demands, [Kiewit] worked overtime,
> implemented schedule work-arounds and design sequence changes,
> and accelerated its work to maintain the Scheduled Completion Date,
> all with Dresser-Rand's knowledge.

Dkt. 1 at 5.  Kiewit seeks to recover for the costs associated with these additional efforts.  *Id.* at 6.

In support of its motion for summary judgment on Kiewit's Project Impact Damages claim, Dresser-

Rand has raised two arguments: (1) Kiewit's Project Impact Damages claim seeks consequential

damages, which the parties waived under Article 909 of the Contract and (2) Kiewit's Project Impact

Damages claim reflects work that would require a Change Order under the Contract, yet no Change

Order was submitted.

### 1.       Whether the Project Impact Damages are Direct or Consequential

#### i.       Parties' Arguments

Dresser-Rand argues that Kiewit's Project Impact Damages claim seeks consequential

damages and therefore is barred under Article 909's consequential damages waiver.  Dkt. 46 at 15.

Dresser-Rand contends that, despite Kiewit's attempt to characterize these damages as "impact

damages," Kiewit plainly seeks damages for delay costs, loss of efficiency, and loss of productivity,

which are consequential in nature.  *Id.* at 10, 15–17.

In response, Kiewit argues that its Project Impact Damages claim seeks only "direct

damages" because the damages flow naturally and necessarily from Dresser-Rand's breaches and

misrepresentations.  *Id.* at 18.  Kiewit contends that many of the key assumptions underlying

Kiewit's bid were proven to be unfounded due to Dresser-Rand's errors, which led to a loss of

productivity.  *Id.* at 18–19.  Importantly, Dresser-Rand was required to provide key technical data

to Kiewit, but the data was late, incomplete, and routinely revised.  *Id.* at 19.  Because Dresser-Rand

created these problems yet refused to alter the Sailaway date, Kiewit was required to work in an

34

inefficient manner and undertake significant acceleration efforts. *Id.* at 20. Kiewit argues that these costs are a direct consequence of Dresser-Rand's misrepresentations and breaches of the Contract, and Dresser-Rand was well aware that Kiewit was incurring these increased costs. *Id.* at 20–21. Kiewit emphasizes that consequential damages are those that depend on the existence of a fact beyond the relationship between the parties, yet its claim for Project Impact Damages arises directly out of Kiewit's contractual relationship with Dresser-Rand. *Id.* at 21–22.

In reply, Dresser-Rand argues that Kiewit has alleged that Dresser-Rand failed to timely provide certain information to Kiewit. Dkt. 55 at 3. Dresser-Rand argues that these allegations are indisputably in the nature of "delay damages" or "loss of productivity" damages, which are consequential in nature. *Id.*

### ii. Analysis

As discussed in detail in Section V above, "actual damages" may be either direct or consequential. *Arthur Andersen*, 945 S.W.2d at 816. "Direct damages are the necessary and usual result of the defendant's wrongful act; they flow naturally and necessarily from the wrong. Direct damages compensate the plaintiff for the loss that is conclusively presumed to have been foreseen by the defendant from his wrongful act." *Id.* (citations omitted). By contrast, consequential damages "result naturally, but not necessarily, from the defendant's wrongful acts." *Id.* Consequential damages "need not be the usual result of the wrong, but must be foreseeable, and must be directly traceable to the wrongful act and result from it." *Id.* Consequential damages "require the existence of some other fact (known or unknown) beyond the relationship between the parties." *Powell Elec. Sys., Inc.*, 356 S.W.3d at 119.

Here, Dresser-Rand has failed to identify any "fact beyond the relationship between the parties" on which Kiewit's Project Impact Damages claim relies. On its face, Kiewit's Project

Impact Damages claim is confined to the parties' relationship and stems solely from Dresser-Rand's alleged failure to meet its obligations to Kiewit, which interfered with Kiewit's ability to perform under the Contract.  At oral argument, Dresser-Rand attempted to equate Kiewit's claim for Project Impact Damages to its own counterclaim to recover for the liquidated damages assessed by PEMEX pursuant to the Purchase Order.  However, the critical difference between these claims is that Dresser-Rand's counterclaim arises out of its relationship with a third party pursuant to a collateral contract, whereas Kiewit's claim arises exclusively from its contractual relationship with Dresser-Rand.

Dresser-Rand emphasizes at multiple points that Kiewit's Project Impact Damages claim seeks to recover for "delay damages" or "loss of productivity" damages.  However, Dresser-Rand has cited to no authority indicating that these types of damages are considered "consequential" under Texas law.  Moreover, the plain language of Article 909 does not prevent Kiewit from seeking damages for delays.  Article 909 does mention "loss of production"; however, Dresser-Rand admitted at oral argument that this provision refers to loss of oil production, not loss of a contractor's productivity.  In support of its position that Kiewit's Project Impact Damages claim seeks consequential damages, Dresser-Rand relies primarily on *U.S. ex rel. Tennessee Valley Marble Holding Co. v. Grunley Const.*, 433 F. Supp. 2d 104 (D.D.C. 2006).  However, that case was decided under Maryland law and involved application of a contractual clause that explicitly prohibited "damages for delay." *Id.* at 109–110.  The case is certainly not binding, but, more importantly, does not even discuss the concept of consequential damages.

The court finds that Dresser-Rand has not established that Kiewit's Project Impact Damages claim constitutes a claim for "consequential damages" as a matter of law.  Kiewit's claim arises directly out of Dresser-Rand's failure to satisfy the terms of the contractual relationship between

36

Kiewit and Dresser-Rand.  Accordingly, Kiewit's Project Impact Damages claim is appropriately classified as a claim for direct damages.

### 2.    Whether the Project Impact Damages Required a Change Order

#### i.    Parties' Arguments

Dresser-Rand's motion discusses in detail the applicability of the Contract's Change Order procedure to this dispute.  At oral argument, the parties discussed the potential relevance of the Contract's Change Order procedure to Kiewit's claim for Project Impact Damages.  Dresser-Rand noted that the Change Order provision in the Contract explicitly requires Change Orders for "[Dresser-Rand]-caused delays," "Breach of [Dresser-Rand's] obligations under this Contract," and "Negative impacts to the Work or Scheduled Completion Date resulting from [Dresser-Rand] Supplied items."  *See* Dkt. 52, Ex. A at Art. 303(A)(iii), (iv), (vi).  Dresser-Rand argued that Kiewit's claim for Project Impact Damages falls squarely within the requirements of the Change Order provision because Kiewit alleges that Dresser-Rand's failure to timely provide certain deliverables created delays and caused Kiewit to incur additional costs.  In response, Kiewit admitted that it did not provide Change Orders for the costs underlying its Project Impact Damages claim.  However, Kiewit argued that it gave formal notice to Dresser-Rand that it was incurring the additional costs that form the basis of its Project Impact Damages claim, but Dresser-Rand nonetheless told Kiewit to finish the Project.  Kiewit therefore argued that Dresser-Rand was well aware that Kiewit was incurring additional costs in connection with accelerating its work on the Project.

#### ii.    Analysis

The court agrees with Dresser-Rand that Kiewit's claim for Project Impact Damages falls squarely within the Change Order requirement of Article 303.  Article 303 explicitly requires a

Change Order to make an adjustment to the Contract Price when the Contract Price increases due to Dresser-Rand's delays or Dresser-Rand's breaches of its obligations under the Contract.  Dkt. 52, Ex. A at Art. 303(A)(iii)-(iv).  On its face, Kiewit's Project Impact Damages claim is based on Dresser-Rand's delays in providing the detailed information Kiewit and Excel needed to complete the Modules.  Dkt. 1 at 5.  The claim stems from costs associated with Dresser-Rand's breach of its contractual obligation to timely provide this information.  *Id.*  Therefore, in order to recover for these increased costs, Kiewit must have submitted a Change Order.  This conclusion is confirmed by Article 302 of the Contract, the provision regarding the Term of Work, which states that "[s]hould [Dresser-Rand] delay or hinder [Kiewit's] performance, [Dresser-Rand] shall equitably adjust the Contract Price and Scheduled Completion Date *by Change Order*."  Dkt. 52, Ex. A at Art. 302 (emphasis added).

It is irrelevant that Kiewit provided Dresser-Rand with "formal notice" that Kiewit was incurring additional costs.  The Contract contains an explicit Change Order procedure, including a particular form for submitting Change Orders.  *See* Dkt. 52, Ex. A. at Art. 303.  Notably, the Change Order form requires approval by both Kiewit and Dresser-Rand.  *See id.*, App. C.  Mere notice that Kiewit was incurring additional costs is not an effective substitute for a Change Order form executed by both parties.

Under the plain terms of the Contract, the costs associated with Kiewit's claim for Project Impact Damages required a Change Order.  Because Kiewit failed to follow the Contract's Change Order procedure, it cannot now recover those costs.  Accordingly, Dresser-Rand's motion for summary judgment is GRANTED with respect to Kiewit's claim for Project Impact Damages.

### D.  Kiewit's Quasi-Contractual Claims

#### 1.        Kiewit's Allegations

In addition to its breach of contract claims, Kiewit has alternatively pled claims for promissory estoppel and unjust enrichment.  Dkt. 1 at 6–7.  Kiewit alleges that Dresser-Rand made promises to Kiewit throughout the Project that induced Kiewit to complete the work, and Kiewit relied on these promises to its detriment.  *Id.* at 7.  Therefore, Kiewit contends that Dresser-Rand should be equitably estopped from arguing that Kiewit is not owed compensation.  *Id.* at 6.  Kiewit also alleges that Dresser-Rand accepted the full benefit of Kiewit's performance and would be unjustly enriched if Kiewit were not fully compensated.  *Id.* at 7.

#### 2.        Parties' Arguments

Dresser-Rand argues that the court must dismiss Kiewit's quasi-contractual claims for promissory estoppel and unjust enrichment because these claims are not available where the parties have entered into an express contract.  Dkt. 46 at 18–19.  In response, Kiewit argues that its claims for promissory estoppel and unjust enrichment are properly pled in the alternative.  Dkt. 52 at 24–25.  In reply, Dresser-Rand argues that these alternative theories of recovery may be appropriate at the pleading stage but are not appropriate at the summary judgment stage.  Dkt. 55 at 3–4.  Dresser-Rand emphasizes that there is no dispute in this case that an express contract exists that governs the rights of the parties.  *Id.* at 4.

#### 3.        Analysis

In *Fordoche Production Co. v. Conoco, Inc.*, it was undisputed that a written contract existed between the parties to the litigation.  52 S.W.3d 671, 683 (Tex. 2000).  However, when the plaintiffs brought suit on the contract, they elected to pursue a claim for unjust enrichment rather than breach of contract.  *Id.*  The defendant argued that the unjust enrichment claim was unavailable to the

plaintiffs because the written contract covered the parties' dispute.  *Id.*  The court agreed with the

defendant and found that the written contract foreclosed any claim for unjust enrichment.  *Id.* at 685.

The court explained that

> [g]enerally speaking, when a valid, express contract covers the
> subject matter of the parties' dispute, there can be no recovery under
> a quasi-contract theory . . . That is because parties should be bound
> by their express agreements. When a valid agreement already
> addresses the matter, recovery under an equitable theory is generally
> inconsistent with the express agreement.

*Id.* at 684 (citations omitted); *see also id.* ("A quasi-contract 'is not a peculiar brand of contract.  It

'is not a contract at all but an obligation imposed by law to do justice even though it is clear that no

promise was ever made or intended.'" (citation omitted)).  The general rule stated in *Fordoche* is

well settled and has been applied in many cases to foreclose quasi-contractual claims like unjust

enrichment and promissory estoppel where an express contract governed the parties' dispute.  *See*

*Williams v. Colonial Bank, N.A.*, 199 F. App'x 399, 403 (5th Cir. 2006) (finding that the plaintiff

could not recover in quantum meruit because the dispute was governed by an express contract and

could not recover in promissory estoppel because he did not allege a promise independent of the

contract); *Jhaver v. Zapata Off-Shore Co.*, 903 F.2d 381, 385 (5th Cir. 1990) ("Under Texas law,

a contract comprising the disputed promise precludes recovery under promissory estoppel."); *Subaru*

*of Am., Inc. v. David McDavid Nissan, Inc.*, 84 S.W.3d 212, 226 (Tex. 2002) ("[T]he

promissory-estoppel doctrine presumes no contract exists . . ."); *TransAmerican Nat. Gas Corp. v.*

*Finkelstein*, 933 S.W.2d 591, 600 (Tex. App.—San Antonio 1996, writ denied) ("Unjust enrichment

characterizes the result of failing to make restitution for benefits received under circumstances giving

rise to an implied or quasi-contract. There can be no recovery if the same subject is covered by an

express contract.   We believe this result is particularly appropriate when sophisticated parties . . . bargain for express contracts." (citations omitted)).

In this case, the parties agree that the Contract is valid and enforceable and governs their dispute.  Therefore, Texas law clearly forecloses Kiewit's alternative theories for unjust enrichment and promissory estoppel.  The cases cited by Kiewit merely indicate that a plaintiff may alternatively *plead* both contractual and quasi-contractual where the existence of an express contract between the parties has not been established.  *See Baisden v. I'm Ready Prods., Inc.*, No. CIV.A. H-08-0451, 2008 WL 2118170, at *10 (S.D. Tex. May 16, 2008) (Lake, J.) (allowing the plaintiff to pursue both an unjust enrichment and breach of contract claim at the motion to dismiss stage, and noting the possibility that the contract would later be held invalid); *Waller v. DB3 Holdings, Inc.*, No. CIV.A.3:07-CV-0491-D, 2008 WL 373155, at *6 (N.D. Tex. Feb. 12, 2008) (holding that it would be premature to dismiss an alternative unjust enrichment claim, given that the contract could be held invalid); *In re Kellogg Brown & Root, Inc.*, 166 S.W.3d 732, 740 (Tex. 2005) (holding that the plaintiff could seek alternative relief under contractual and quasi-contractual theories where the plaintiff was a non-signatory to the subcontract at issue); *Freeman v. Carroll*, 499 S.W.2d 668, 670 (Tex. Civ.—Tyler 1973, writ ref'd n.r.e.) (noting that the plaintiff was permitted to allege both a contract and quantum meruit theory where there was a disputed issue regarding whether a contract had been established, and distinguishing this situation from cases where the existence of a contract was conclusively established or stipulated to by the parties).  Here, by contrast, the case is at the summary judgment stage and the existence of the Contract has been conclusively established.  Therefore, Kiewit cannot maintain its alternative, quasi-contractual claims.  Accordingly, Dresser-Rand's motion for summary judgment is GRANTED with respect to Kiewit's claims for unjust enrichment and promissory estoppel.

## VIII.  KIEWIT'S MOTION FOR PARTIAL SUMMARY JUDGMENT ON PAYMENT OF INVOICES DR-04B, 05, AND 06

### A.    Parties' Arguments

On February 26, 2016, Kiewit filed a motion for partial summary judgment on payment of Invoices DR-04B, 05, and 06.  Dkt. 47.  The provisions of the Contract relevant to this motion are outlined in detail above in subsection VII.A.  Kiewit argues that the Contract is not for a "lump sum," as Dresser-Rand claims, and emphasizes the variable pricing mechanisms used in the contract (e.g., unit rate, cost plus, time and materials) and the clear language of the Contract indicating that many of the prices referenced in the Contract were estimates (e.g., references to the "target estimate" and "approximate milestone values").  Dkt. 47-1 at 7–8.  Kiewit emphasizes that it is undisputed that Invoices DR-04B, 05, and 06 accurately reflect costs actually incurred by Kiewit.  *Id.* at 10.

In response, Dresser-Rand does not argue that the Contract is for a lump sum—rather, it argues that the Project experienced changes in the Scope of Work that required Change Orders, which Kiewit did not submit.  Dkt. 51 at 1, 10.  Dresser-Rand points out that it is undisputed that Kiewit did not submit Change Orders for the work reflected in Invoices DR-04B, 05, and 06.  *Id.* at 4.  In support of its position that the Scope of Work changed on the Project, Dresser-Rand cites to testimony from Kiewit's president indicating that the Project did not follow the "original plan."  *Id.* at 4–5.  Dresser-Rand also cites to testimony and documents from Excel personnel indicating that the Project experienced scope changes.  *Id.* at 5.  Dresser-Rand further argues that an increase in Contract Price of approximately $10 million dollars was clearly not within the parties' contemplation at the time of contracting.  *Id.* at 10.  To permit an increase in Contract Price of this magnitude, Dresser-Rand argues, would effectively render meaningless the provision in the Contract referencing the Contract Price.  *Id.* at 10–11.

42

In reply, Kiewit emphasizes that Dresser-Rand has conceded that the Contract is not for a lump sum. Dkt. 54 at 2. Kiewit therefore argues that the Contract contemplated the evolution of the target estimate Contract Price through actual costs incurred and submitted pursuant to invoices. *Id.* at 3. Kiewit contends that the Contract squarely placed the risk for cost and quantity increases, and the converse benefit of cost and quantity decreases, on Dresser-Rand. *Id.* at 4. Kiewit argues that Dresser-Rand cannot ask the court to re-write the Contract now that the risk has not played out in Dresser-Rand's favor. *Id.*

## B.   Analysis

It is undisputed that Invoices DR-04B, 05, and 06 accurately reflect actual costs incurred by Kiewit and that Kiewit did not submit Change Orders regarding this work. Therefore, the only question before the court on this motion is whether the work reflected in Invoices DR-04B, 05, and 06 constitutes a change in the Scope of Work, thereby requiring a Change Order under the Contract. As noted above, "Scope of Work" is defined term in the Contract that is described in detail in Appendix E. *See supra* subsection VII.B.2; *see also* Dkt. 52, Ex. A, App. E. Dresser-Rand has identified no section of Appendix E that changed throughout the Project. Instead, Dresser-Rand has relied primarily on testimony from Excel employees and documents from Excel indicating that Excel experienced scope changes during the pendency of the Project. Dkt. 51 at 5–7. However, as discussed previously, Excel's scope of work under its subcontract is fundamentally distinct from Kiewit's Scope of Work, as that term is defined in the Contract. Dresser-Rand has produced evidence indicating that Excel's scope of work changed as defined in its subcontract, but Dresser-Rand has produced no evidence that those scope changes corresponded to a change in the Scope of Work set forth in Appendix E. Dresser-Rand has also cited testimony from Kiewit's president,

indicating that the Project deviated from the "original plan." Dkt. 51 at 4–5. However, Dresser-Rand has made no attempt to link this supposed deviation to any provision in Appendix E.

Dresser-Rand also argues that if Kiewit is permitted to invoice Dresser-Rand for costs far above the estimated Contract Price, the estimated price will be rendered meaningless. Dkt. 51 at 10–11. However, the Contract contains no provision limiting increases in the Contract Price. For the majority of work on the Project, the Contract employs pricing mechanisms that depend on the actual costs incurred by Kiewit. *See* Dkt. 52, Ex. A, App. A at 701 ("Approximate milestone values are based on the target estimate. Actuals will invoice based on engineering drawings and quantities."); *id.*, App. E at Tbl. 1 (outlining the "commercial mechanisms" used to calculate the costs associated with each discipline of work, and requiring most disciplines to be priced considering the actual costs incurred). A plain reading of the Contract indicates that the parties intended for the Contract Price to be flexible based on the actual cost of the work and that Dresser-Rand accepted the potential risk of cost overages and the potential benefit of cost savings. As Kiewit has stated, it is not the court's role to alter the allocation of risk that the parties agreed to in their Contract. *El Paso Field Servs., L.P. v. MasTec N. Am., Inc.*, 389 S.W.3d 802, 811 (Tex. 2012) ("The Court's role is not to redistribute these risks and benefits but to enforce the allocation that the parties previously agreed upon . . . Freedom of contract allows parties to . . . allocate risk as they see fit." (citations and internal quotation marks omitted)).

Dresser-Rand has failed to raise a genuine issue of  material fact that a Scope Change occurred on the Project requiring a Change Order under Article 303 of the Contract. The evidence before the court indicates merely that the actual cost of completing the original Scope of Work increased beyond the parties' initial estimations. However, the parties built nothing into the Contract to protect against this result. Dresser-Rand accepted the work reflected in Invoices DR-04B, 05, and

06, and must reimburse Kiewit appropriately under the terms of the Contract.  Accordingly, Kiewit's motion for partial summary judgment on payment of Invoices DR-04B, 05, and 06 is GRANTED.

## IX. CONCLUSION

Kiewit's motion for partial summary judgment on Dresser-Rand's counterclaim for damage to modules (Dkt. 15) is GRANTED.  Kiewit's motion for partial summary judgment on Dresser-Rand's counterclaim for warranty damages (Dkt. 17) is GRANTED. Kiewit's motion for partial summary judgment on Dresser-Rand's counterclaim for liquidated damages (Dkt. 19) is GRANTED. Kiewit's motion for partial summary judgment on payment of Invoice DR-07 (Dkt. 22) is GRANTED.  Dresser-Rand's motion for summary judgment on Kiewit's complaint (Dkt. 46) is GRANTED with respect to Kiewit's claims for Project Impact Damages, promissory estoppel, and unjust enrichment, and DENIED with respect to Kiewit's claims under Invoices DR-04B, 05, and 06.  Kiewit's motion for partial summary judgment on Invoices DR-04B, 05, and 06 (Dkt. 47) is GRANTED.

Kiewit is ORDERED to prepare a proposed final judgment incorporating these rulings and present it to Dresser-Rand for approval as to form.  This proposed final judgment is to be submitted to the court within twenty days of the date of this order.

The parties are ORDERED to confer regarding attorney's fees and inform the court if they cannot reach an agreement within twenty days of the date of this order.

Signed at Houston, Texas on September 1, 2016.

Gray H. Miller
United States District Judge

45